IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TONYA CARSWELL, )
    Plaintiff, )
)
vs. ) Civil Action No. 12-1611
) Chief Judge Conti
UPMC/UPMC BRADDOCK HOSPITAL, et al., ) Magistrate Judge Mitchell
    Defendants. )

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion for summary judgment filed on behalf of the remaining defendants, UPMC and UPMC Braddock Hospital (ECF No. 39), be granted.

II.    Report

Plaintiff, Tonya Carswell, brings this pro se action alleging a claim of retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII), against Defendants, UPMC and UPMC Braddock Hospital.[1] She alleges that, after she filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) in October of 2008, she was discharged from her position as a Patient Business Service Representative at UPMC Braddock Hospital on April 3, 2009.

Presently pending before the Court is a motion for summary judgment, filed by the remaining Defendants. For the reasons that follow, the motion should be granted.

Facts

Plaintiff was hired by UPMC Braddock Hospital as a part-time Patient Verification

---

[1] Plaintiff's Amended Complaint contained five claims against eight defendants (ECF No. 1-1). However, on March 21, 2013, the Court entered an order (ECF No. 16), which granted in part and denied in part Defendants' motion to dismiss (ECF No. 6), adopting a Report and Recommendation filed on January 28, 2013 (ECF No. 14). As a result, only the retaliation claim against UPMC and UPMC Braddock Hospital remains in the case.

Interviewer on October 6, 1999. (Carswell Dep. at 34.)[2] Her job duties included verifying insurance benefits for hospital stays, skilled nursing facility nursing and rehabilitation services in the Admissions Department. (Carswell Dep. at 43.) In 2005, she moved to a full-time position in the Outpatient Department where she registered patients who needed outpatient services, including bloodwork, x-rays, CT scans, MRIs, PET scans, speech therapy and physical therapy. (Carswell Dep. at 45, 48.) There were two other full-time employees in the Outpatient Department in 2005, Jean Durik and Karen Scavincky. (Carswell Dep. at 46.)

Plaintiff's immediate supervisor throughout her employment was Flora Franzetta. (Carswell Dep. at 49; Franzetta Dep. at 8.[3]) The Department Manager from the time of her hire until approximately 2005 was Joseph Mikulski. (Carswell Dep. at 49.)

Plaintiff admits that she has a chronic tardiness problem. (Carswell Dep. at 68.) During her employment at UPMC Braddock Hospital, Plaintiff was often late, stating "I was always late so many times" and "I've always been late coming to work, so this has always been an issue for me." (Carswell Dep. at 41, 68.) She was late regardless of which shift she worked. (Carswell Dep. at 90.)

Early in her employment, Plaintiff worked a 3:00 p.m. to 11:30 p.m. shift. It was then changed to a 1:00 p.m. to 9:30 p.m. shift and after some time, to a 10:00 a.m. to 6:30 p.m. shift. The 10:00 a.m. shift was moved to a 9:00 a.m. start time and eventually to a 9:30 a.m. start time. (Carswell Dep. at 73-75.) She also worked, either on a part-time or occasional basis, a variety of

---

[2] Defs.' App. (ECF No. 41-1) Tab A. These facts are taken from Defendants' Statement of Undisputed Material Facts (ECF No. 41) and are supported by the materials contained in the Appendix, as required by Local Rule 56.B.1, 3. As Defendants note, Plaintiff has not responded to these facts individually with denials supported by citations to the record, as required by Local Rule 56.C.1, 3. Rather, she has filed a document entitled Statements Disputing Defendants['] Nonfactual Materials (ECF No. 44) in which she frequently responds to groups of Defendants' factual statements with narrative and she never cites to the record.
[3] ECF No. 41-1 Tab B.

other shifts, including 8:00 a.m. to 6:30 p.m., 9:00 a.m. to 1:00 p.m., 12:00 p.m. to 8:30 p.m., 11:00 p.m. to 7:00 a.m. and 6:30 a.m. to 3:00 p.m. (Carswell Dep. at 76.) She did not request to move her shifts; rather, her shift was moved throughout her employment to accommodate the needs of the Department (Carswell Dep. at 76.)

Plaintiff was late regardless of the shift she was working. She testified "if you're concluding that it didn't matter what time I was scheduled to work, I was always late, then yes … it's accurate." (Carswell Dep. at 90.)

When she was hired, Plaintiff signed an acknowledgment of receipt of the UPMC Braddock Employee Handbook. (ECF No. 41-1 Tab C at UPMC00171.) The UPMC Policy and Procedure Manual included a Corrective Action and Discharge Policy. (Carswell Dep. Ex. 2.) She was familiar with the policy, which detailed the disciplinary process. (Carswell Dep. at 39.) UPMC Braddock Hospital also had an Absenteeism and Tardiness policy, which Plaintiff acknowledged applied to her. (Carswell Dep. at 40.)

On November 12, 1999, approximately one month after Plaintiff was hired, Franzetta warned her that she was expected to show up at work on time. (Carswell Dep. Ex. 5.) Franzetta told her that it was important to be on time, not just because of the departmental and system rule but also because it was necessary to be at her station for her scheduled time.

Despite being cautioned about the importance of punctuality as early as 1999, Plaintiff continued to arrive late. As a result, she received disciplinary actions from Mikulski, the Department Manager, as follows:

- 1st quarter of 2000 (23 instances of tardiness) (ECF No. 41-1 Tab C at UPMC00236).
- 2nd quarter of 2000 (26 instances of tardiness) (Id. at UPMC00235).
- 3rd quarter of 2000 (8 instances of tardiness) (Id. at UPMC00233).

3

- 4th quarter of 2000 (5 instances of tardiness) (Id. at UPMC00232).

- 4th quarter of 2001 (13 instances of tardiness) (Id. at UPMC00231).

- 4th quarter of 2002 (23 instances of tardiness) (Id. at UPMC00213).

- 1st quarter of 2003 (17 instances of tardiness) (Id. at UPMC00211).

- 2nd quarter of 2003 (26 instances of tardiness) (Id. at UPMC00208).

- 3rd quarter of 2003 (27 instances of tardiness) (Id. at UPMC00206).

- 4th quarter of 2003 (31 instances of tardiness) (Id. at UPM 00204).

- 1st quarter of 2004 (9 instances of tardiness) (Id. at UPMC00202).

In the first quarter of 2004, Plaintiff received a suspension. (Carswell Dep. at 82-97.)

Mikulski disciplined Plaintiff by monitoring her tardiness every quarter. Tardiness in each quarter would result in one disciplinary action, a verbal or written warning or suspension, regardless of how many times she had been tardy that quarter. (Carswell Dep. at 83, 87-89; ECF No. 41-1 Tab C at UPMC00202-36.) According to Plaintiff, Mikulski showed her some compassion and courtesy because he knew that she had personal problems at home and because, other than her tardiness problem, she was a good employee. (Carswell Dep. at 94-95.) Despite the flexibility showed by Mikulski, Plaintiff believed that her 2004 suspension was "long overdue." (Carswell Dep. at 98.)

Randi Weir became the Senior Manager of the Patient Access Department in 2005 and remained in that position for approximately two and half years. (Carswell Dep. at 50; Weir Dep. at 8.[4]) Weir disciplined Plaintiff for tardiness during her tenure as head of the Department, as follows:

Verbal warning – excessive late arrivals, July 17, 2006 (ECF No. 41-1 Tab C at UPMC00170)

---

[4] ECF No. 41-1 Tab F.

Verbal warning – tardiness, December 26, 2006 (Id. at UPMC00182-83)

Written warning – tardiness, February 14, 2007 (Id. at UPMC00182-83)

In addition, Weir disciplined Plaintiff in January 2006 for saying "Damn niggers get no respect around here" and gave her a three-day suspension in December 2006 for an incident in which Plaintiff parked in the Emergency Room parking lot, a prohibited parking location for staff. Plaintiff told Weir that her brother dropped her off and must have parked inappropriately. After being shown security footage that she herself had parked the car in the prohibited location, Plaintiff admitted that she had lied. (Carswell Dep. at 65, 239-40; Weir Dep. Ex. 1; ECF No. 41-1 Tab C at UPMC00256-57.)

Weir encouraged Plaintiff to improve her behavior and instructed her that if she had six months of good performance without any disciplinary action, she would be promoted. (Carswell Dep. at 61; ECF No. 41-1 Tab C at UPMC00170.) Plaintiff was also encouraged to use the employment assistance program, a resource to assist her with her inability to show up at work on time. (Carswell Dep. at 103 & Ex. 19.) As part of her efforts to assist Plaintiff, Weir met with her to discuss her performance evaluations in 2006 and 2007. In these meetings, Weir told Plaintiff that she needed to follow the punctuality guidelines and that she should strive to improve her punctuality. (Carswell Dep. Exs. 20, 21.)

Plaintiff understood that she was expected to be at work on time. (Carswell Dep. at 109-10.) Nonetheless, she was unable to meet the goal of being on time and discipline-free for six consecutive months and, therefore, Weir never promoted her. (ECF No. 41-1 Tab C at UPMC00170.)

On or about August 21, 2007, Weir and Franzetta asked Plaintiff to change her shift from a 10:00 a.m. start time to a 9:00 a.m. start time, so that she would work from 9:00 a.m. to 5:30

p.m. (Franzetta Dep. at 17-18.) The change in the schedule was necessary due to staffing needs as the Department was understaffed; specifically to help co-worker Jean Durik. (Carswell Dep. at 119; Franzetta Dep. at 17-18, 21.)[5] This was initially described to her as a trial shift. (Carswell Dep. at 118-19; Franzetta Dep. at 17.) Franzetta stated that Weir told Plaintiff "as long as you can get here as soon as you possibly can, we're satisfied with that. Nothing will be held against you. Because we need you to come in for that shift, do the best you can." (Franzetta Dep. at 20.)[6]

Nevertheless, Plaintiff admitted that the shift was not changed back because the Department was understaffed and UPMC Braddock Hospital needed her assistance before 10:00 a.m. Although Plaintiff preferred a 10:00 a.m. start time, she knew that employees at the hospital were not allowed to select their shift start times. (Carswell Dep. at 77; Franzetta Dep. at 44.)[7]

Shortly after moving Plaintiff's shift in the fall of 2007, Weir left UPMC Braddock Hospital and Karen O'Malley became the Manager of the Department in January of 2008. (Weir Dep. at 19-20; O'Malley Dep. at 7[8].) O'Malley spent several months trying to become familiar with the needs of the Department. She found that several areas needed her immediate attention and, as a result, did not enforce the time and attendance policy against any employee from January until September 2008. (O'Malley Dep. at 11.)

---

[5] Plaintiff states that the shift change "was to accommodate a lazy worker, Jean Durik that refused to be a team player by doing her part as a paid employee." (ECF No. 44 ¶ 40.) However, that is not what Franzetta stated at her deposition.
[6] Pl.'s Br. (ECF No. 43) Attach. 1.
[7] Plaintiff argues that "there were two other full-time employees in her department that should have been required to pick up the slack." (ECF No. 44 ¶¶ 41-43.) Again, however, she cites no authority in support of the contention that she was unduly imposed upon while others were not.
[8] ECF No. 41-1 Tab G. Plaintiff contends that Weir left "almost a year after moving [her] shift," ECF No. 44 ¶ 44, but the record establishes that Weir changed Plaintiff's shift on August 21, 2007 and that she left in January 2008. See also Franzetta Dep. at 21.

6

From August 2007 to April 2008, Plaintiff was occasionally 10-15 minutes late for her 9:00 a.m. shift. (Carswell Dep. at 125-26 & Ex. 23 at 12-18.) After noticing this pattern and learning that Plaintiff preferred a later shift, O'Malley in April 2008 moved Plaintiff's start time to 9:30 a.m. She believed this would accommodate both Plaintiff's needs and the needs of the Department. (Carswell Dep. at 127 & Ex. 23 at 22; O'Malley Dep. at 19.)[9]

For some time, this change accommodated Plaintiff, as she was only late on two occasions for her 9:30 shift from April 2008 through September 2008. (She was late on four different occasions for an earlier, occasional 6:30 or 7:30 a.m. shift.) (Carswell Dep. at 127-29 & Ex. 23 at 21-27.) As a result of Plaintiff's improvement with regard to time and performance, O'Malley promoted her to Patient Business Service representative in July 2008. (O'Malley Dep. at 10.)

On September 24, 2008, O'Malley met with the entire staff of the Patient Access Department and discussed UPMC Braddock Hospital's Time and Attendance policy. (Carswell Dep. Exs. 25, 26; O'Malley Dep. at 15-16.) Specifically, O'Malley noted that a time detail report showed late punches and absences for the Department. She reminded the entire staff that everyone must adhere to the policy and that there would be "monitoring and addressing time and attendance violations moving forward." (Carswell Dep. Exs. 25, 26.) O'Malley states that she told the staff that from that day forward the policy would be "strictly enforced." (O'Malley Dep. at 15.) Plaintiff attended this meeting. (Carswell Dep. at 165 & Ex. 25.)

After being late only twice for the 9:30 a.m. shift from April to September 2008, Plaintiff was late eighteen times between the week after her supervisor warned her that she would be

---

[9] Plaintiff contends that, at a meeting "eight months" after the shift change (that is, in April 2008), Franzetta and Weir promised her she could return to her 10:00 a.m. start time (ECF No. 43 at 2). However, as documented above, Weir had left the hospital in January.

7

enforcing the time and attendance policy and January 2009. (Carswell Dep. Ex. 23 at 27-31.) When asked why she could not be on time for the 9:30 a.m. shift, if she was only ten to fifteen minutes late for a 9:00 shift, Plaintiff explained that she was exhausted. (Carswell Dep. at 131.) Plaintiff notes that she was not disciplined for these eighteen instances of tardiness and argues that this was because she continued to fulfill the needs of the Department and the plan to get rid of her had not yet been put together.

In October 2008, Plaintiff filed a complaint with the EEOC, alleging that she was treated unfairly and was subjected to a hostile work environment in August, September and October 2008 by her former co-worker, Jean Durik, and by a supervisor in her Department, Jashara Craig. (Am. Compl. ¶ 5.)[10] She has alleged that the discipline she received for her late arrivals after this date was in retaliation for filing this complaint, but Defendants observe that she was warned in September 2008, before filing her EEOC complaint, that the time and attendance policy would be strictly enforced. (Carswell Dep. at 174-75.)

On January 16, 2009, O'Malley held a six-month PBS representative evaluation meeting with Plaintiff and issued a verbal warning regarding her tardiness. (Carswell Dep. Ex. 26.) During that meeting, Plaintiff was given a written performance evaluation which noted that she "continues to have difficulties with late punches in the last six months. Immediate and sustained improvement in this area is required due to the fact that she has been counseled on this in the past." (Carswell Dep. at 114.)

Plaintiff understood that this meant she was expected to be on time for work. This was the first performance evaluation conducted by O'Malley and it had the lowest rating Plaintiff had received to date. (Carswell Dep. at 115.) During the meeting, O'Malley stressed that if her shift

---

[10] ECF No. 1-1 at [16]. On June 25, 2012, the EEOC issued her a Right to Sue letter. ECF No. 1-1 at [12].

was set to start at 9:30 a.m., the expectation was that Plaintiff needed to be there at 9:30 a.m. (Carswell Dep. at 167.)

Plaintiff then asked when she would be moved back to her regular 10:00 a.m. shift, but O'Malley, who thought that the shift change had originally been at Plaintiff's request (Franzetta Dep. at 24),[11] explained that this shift no longer existed. However, O'Malley indicated that there was a position available in the 3:00 p.m. to 11:00 p.m. shift and a possibility of a position opening up in the 11:00 p.m. to 7:00 a.m. shift. (O'Malley Dep. at 13.) Plaintiff states that neither position was available and both were only "possibilities." (Carswell Dep. at 167-69.) She acknowledges, however that she did not request either of these shifts. (Carswell Dep. at 168-69.)

Because the shift was not changed, Plaintiff understood that she was expected to arrive for her shift by 9:30 a.m. (Carswell Dep. at 169.) Nonetheless, Plaintiff was late on six occasions between January 14, 2009 and February 17, 2009, specifically: January 14 and 20, February 5, 6, 11 and 17. On February 17, 2009, she was more than a half hour late for her shift and did not follow proper procedure to page her supervisor to let her know she would be late. (Carswell Dep. at 170-73 & Ex. 23 at 31-32, Ex. 27.)

As a result, O'Malley issued a written warning for tardiness on February 17, 2009 in accordance with the policy. (Carswell Dep. Exs. 3, 27.) Plaintiff filed a grievance with regard to this disciplinary action because she felt that it was inappropriate when she had been denied the ability to return to a 10:00 a.m. shift. (Carswell Dep. at 172-73.) She wrote:

> I received a written warning for being late to work several times. Karen, at this meeting, you reminded me of our discussion concerning my late arrivals to work and my constant shift changes at my 6mth evaluation in January 2009. During our discussion in January you mentioned that if the shift calls for me to be here at

---

[11] ECF No. 43 Attach. 1.

> 9:30am, I need to be here at 9:30am, and if that did not work for me there are later shifts in the department that I could consider working. I believe I responded by saying I did not consider working a later shift because my shift is 10:00am-6:30pm. I believe I also explained that before Randi Chorbirko Weir resigned as our manager she was suppose[d] to allow me to go back to my regular shift 10:00am-6:30, but you ignored me. So when you say, if the shift calls for me to be here at 9:30am I need to be here at 9:30am doesn't add up or make sense. Randi was doing some trial things that did not work, but instead of Randi fixing her errors she left and left our department a disaster. We all know the shift does not call for me to be here at 9:30am. We all know that when Randi eliminated the 8:00am-1:00 shift in outpt and altered my shift it was to accommodate Jean Durik and not the department and you picked up right where she left off as far as the outpt situation goes, but instead of all of you guys in charge making Jean be a team player by carrying her own work load so Karen Scavincky would not have to [keel] over by carrying her own workload as well as Jean's, and at the same time causing me to be drained physically trying to balance being a single mother and a dedicated employee by trying to race the clock and stressed out because all of you guys refuse to be reasonable and fair to me. I believe it is totally unfair for any one of you to have a stern disposition concerning the matter. I do not appreciate enduring stress or being physically drained because you refuse to be fair to me. My shift being altered is not to accommodate the outpatient department it accommodates Jean Durik and that is totally unfair.
>
> I am requesting that the written warning issued to me on 2-18-09 be rescinded and those late punches not be held against me.

(Carswell Dep. Ex. 30.) O'Malley wrote back to Plaintiff that her grievance had been reviewed by Human Resources and "it has been determined that the written warning will stand and your grievance is denied." (ECF No. 43-1 at 33.)

The day after she was issued the written warning, Plaintiff was twelve minutes late and did not page her supervisor regarding her tardiness as required by the policy that had been discussed with her the previous day. (Carswell Dep. Ex. 28.) On February 19, 2009, Plaintiff was given a final written warning in lieu of suspension and was warned that any future violations would result in her termination. (Carswell Dep. at 178 & Ex. 28.)

In March 2009, Franzetta warned Plaintiff on two different occasions that she needed to be careful regarding her late punches, as further infractions would result in disciplinary action.

(Carswell Dep. Ex. 29.) Finally, Plaintiff was late again on April 1, 2009, resulting in her discharge from employment on April 3, 2009. (Carswell Dep. at 188 & Ex. 31.)

When asked why she believed this termination was wrongful, Plaintiff responded:

> The basis is that, like I said, I was accused of willful misconduct. They call that willful, wanton, deliberately disregarding the rule, and that was not the case. Like I stated previously, I was asked to come in early to help out my department and I was also told that I would return to my original shift, and that didn't happen and I was never informed that my shift … wasn't available or wasn't there anymore. It was just, well, I thought you wanted to work that shift. It was just … I don't feel that I should have been terminated for that because of the circumstances that surrounds my lates. It wasn't something that they weren't aware that I really couldn't do because of, you know, my home life and my children.

(Carswell Dep. at 225-26.)

Plaintiff has provided extensive and varied reasons for why she was late regardless of her scheduled start time. (Carswell Dep. at 90.) For example, Plaintiff claims that in the year 2000, she was late because she was still adapting to the death of her husband in 1999. (Carswell Dep. at 86-87.)[12] She was also late because of her "personal business" and because the different shifts that she had to work could be overwhelming ("A lot of it probably had to do with, like, the many different shifts, you know, my personal business, also.") (Carswell Dep. at 89.) On some occasions, she was late due to extremely cold temperatures which caused her car not to start. (Carswell Dep. at 104-05.) For a period of time, she was late because of construction on the Rankin Bridge. (Carswell Dep. at 130, 136.)

She stated that she was late for her 9:30 a.m. shift because she was too tired ("It has a lot to do with exhaustion.") (Carswell Dep. at 131.) On her final day, she was late because she had problems finding a parking space. (Carswell Dep. at 179.) Finally, she stated that:

---

[12] Early in the morning of November 18, 1999, Plaintiff's husband, Gilbert Carswell, was shot and killed by Borough of Homestead police as they tried to apprehend him after he repeatedly attacked her and her home. In July, she had applied for two protection from abuse orders. Carswell v. Borough of Homestead, 381 F.3d 235, 237-38 (3d Cir. 2004).

11

> It's like, the nature of a woman not to even be doing that much work but taking care of their kids is the job that women really are designed to do. So even though, you know, I'm a single mom and I have to take care of my children and that's not really something I'm designed to do, I do it the best I can do.

(Carswell Dep. at 135.)

Defendants note that there is no pattern or logic to Plaintiff's tardiness: she was late only once between November and December 2007 for a 9:00 a.m. shift, yet she was late eleven times during a similar time period in 2008 for the later 9:30 a.m. shift. (Carswell Dep. at 137 & Ex. 23.) Indeed, by her own admission, it did not matter what time her shift began; she was late. (Carswell Dep. at 90.)

Procedural History

On November 5, 2012, Defendants removed this case from the Court of Common Pleas of Allegheny County, Pennsylvania on the basis of the federal question presented by the Title VII claims asserted in the Amended Complaint Plaintiff had filed on October 16, 2012. As noted above, Plaintiff's Amended Complaint contained five claims (unlawful harassment, retaliation, wrongful termination, wrongful denial of unemployment compensation and "infliction of emotional stress") against eight defendants (including managers, directors, supervisors and employees at UPMC Braddock Hospital) and she asks for compensation in the amount of $10 million (ECF No. 1-1). However, on March 21, 2013, the Court entered an order (ECF No. 16), which granted in part and denied in part Defendants' motion to dismiss (ECF No. 6), adopting a Report and Recommendation filed on January 28, 2013 (ECF No. 14). As a result, only the retaliation claim against UPMC and UPMC Braddock Hospital in Count II remains in the case.

On December 2, 2013, the remaining Defendants filed a motion for summary judgment (ECF No. 39), along with a brief in support (ECF No. 40), a Concise Statement of Material Facts (ECF No. 41) and an appendix of materials (ECF No. 41-1). Plaintiff filed her opposition on

January 3, 2014 (ECF No. 42), along with a brief in support thereof (ECF No. 43) and Statements Disputing Defendants' Nonfactual Materials (ECF No. 44). Defendants filed a reply brief on January 16, 2014 (ECF No. 45).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendants contend that: 1) Plaintiff cannot establish a prima facie case of retaliation discrimination because she cannot point to any facts showing that her protected activity was the

"but-for" cause of the discipline she received; 2) even if she could establish a prima facie case, they have proffered a legitimate, non-discriminatory reason for her termination, namely her repeated tardiness, and she has not pointed to evidence from which the trier of fact could conclude that this reason is a pretext for unlawful discrimination; and 3) she cannot maintain a claim against UPMC because it was not her employer (UPMC Braddock, a separate entity, was).

Plaintiff responds that: 1) she can establish a prima facie case of retaliation discrimination because her tardiness was well-known and tolerated until she made a complaint of discrimination; 2) similarly, she has cited the fact that her tardiness issues were well-known and were not used against her until she complained of discrimination, and thus she has proffered evidence of pretext; and 3) UPMC has been her employer since 1996 and her letter of termination refers to her employer as "UPMC."[13]

Retaliation Claims

Discrimination against an individual who has opposed a practice prohibited by Title VII or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII is itself actionable conduct. A plaintiff may submit a claim for retaliation. 42 U.S.C. § 2000e-3(a).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981). Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc).

The Court of Appeals has stated that:

---

[13] The Court need not reach the argument about whether UPMC was Plaintiff's employer.

> To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action.

Weston v. Commonwealth of Pa., 251 F.3d 420, 430 (3d Cir. 2001). The Supreme Court has recently clarified that, as to the third prong, a plaintiff making a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." University of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2534 (2013).

The Court of Appeals has "indicated that temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is unusually suggestive of retaliatory motive." Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (internal quotation marks omitted). However, the court has declined to infer such a causal link where an employee's negative performance evaluations predated any protected activity. Id. at 504-05. Evidence of ongoing antagonism can also be sufficient to establish a causal link. Abramson v. William Paterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is,

15

the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

    Plaintiff's Prima Facie Case

Filing an EEOC complaint is a protected activity. Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).[14] And being terminated from one's job is unquestionably an adverse employment action. But Defendants deny that Plaintiff can state a prima facie case of retaliation discrimination because she cannot make a causal connection between the two events, noting that she received repeated warnings prior to any protected activity that her tardiness would subject her to discipline up to and including dismissal. Plaintiff responds that, although she was late on several occasions from August 2007 until July 2008, she received a promotion, but after she filed her EEOC complaint in October 2008, Defendants devised a plan of action to get rid of her because of her complaints and her charge. She notes that, despite O'Malley's announcement at the meeting on September 24, 2008 informing everyone that the tardiness policy would be strictly enforced, she was late eighteen times in a four-month period yet suffered no discipline.

"Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." LeBoon v. Lancaster Jewish Community Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (citations omitted). Here, there is a gap of six months between Plaintiff's protected activity (filing an EEOC

---

[14] Plaintiff's brief also refers to two internal complaints she filed in August and September 2008 (ECF No. 43 at 4). However, as Defendants observe, the August issue involved a patient being erroneously told that Plaintiff called her home, but Plaintiff admitted that this incident was not related to race. (Carswell Dep. at 212-13, ECF No. 45 Ex. A). The September complaint concerned an incident when Plaintiff reported that Jean Durik yelled at her, but it makes no reference to race, discrimination or any other protected activity (ECF No. 45 Ex. B). In addition, although these incidents precede the September 24, 2008 meeting, they are also further removed in time from the discipline she received for tardiness in January, February and April 2009.

16

complaint in October 2008) and the adverse employment action (she was fired on April 3, 2009). Nor has she pointed to evidence of ongoing antagonism, other than the fact that her employer continued to document and issue warnings to her for her repeated and admitted tardiness. Plaintiff's prima facie case is not a strong one. Nevertheless and out of an abundance of caution, the Court can assume that she has stated a prima facie case of retaliation discrimination. For the reasons that follow, however, her claims do not survive summary judgment.

Defendants' Proffered Reason and Plaintiff's Evidence of Pretext

Defendants contend that Plaintiff was terminated because she was continually late for work and notes that she even admits that all of the late arrivals occurred as documented. Thus, Defendants have thus satisfied their relatively light burden of production. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that this proffered reason is a pretext for unlawful retaliation discrimination and proceeds along "Fuentes prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). That is, she argues essentially that, because her tardiness was well-known and somewhat tolerated, the employer's decision to enforce the policy more strictly against her after she filed a complaint with the EEOC constitutes evidence of pretext. She contends that, in November 2008, Defendants became aware of her EEOC complaint and documents listing the harassment she was allegedly subject to when these items were "extracted" from her computer on a day she was not at work, and that a plan was devised to get rid of her. She also argues that the hospital's refusal to allow her to return to her 10:00 a.m. shift time was unfair.

The difficulty with Plaintiff's first argument is that the record is undisputed that her late

17

arrivals were documented and resulted in disciplinary actions long before her EEOC complaint was filed and she attended a meeting on September 24, 2008 (prior to filing her EEOC complaint) at which she was told that the time and attendance policy would be strictly enforced. In this case, the employer documented Plaintiff's repeated tardiness and its progressive response: verbal warnings, written warnings, final warning and dismissal.

Moreover, as Defendants note, at the time O'Malley announced strict enforcement of the time and attendance policy, Plaintiff's tardiness issues had drastically improved—she was only late for her 9:30 shift twice between April and September 2008. (Carswell Dep. Ex. 23 at 21-27.) Thus, her contention that she was being "set up" to fail because her tardiness issues were well known does not even comport with the evidence of record. In addition, this Court is unaware of any support for the contention that an employer may not announce and then carry out enforcement of a neutral policy such as time and attendance requirements even if it is aware that a particular employee is likely to fail to meet the policy. To the contrary, the Court of Appeals has held that, when an employee's absences or late arrivals are documented and undisputed, the employee cannot show that being terminated for these reasons is pretextual. See Neely v. U.S. Postal Serv., 207 F. App'x 681, 685 (3d Cir. Jan. 26, 2009). See also Neal v. Genesis Properties of Del., Ltd. P'ship, 870 F. Supp. 2d 369, 379 (D. Del. 2012) (employee alleged that reprimands for tardiness were a form of retaliation, but employee handbook showed that she could have been fired long before she was for repeated tardiness).

As noted above, the Supreme Court has held that a plaintiff asserting a retaliation claim must establish that her protected activity was the but-for cause of the adverse employment action. Nassar, 133 S.Ct. at 2534. See also Verma v. University of Pa., 533 F. App'x 115, 119 (3d Cir. Aug. 7, 2013) (university employee alleged that her firing in 2008 constituted retaliation,

but she began receiving negative evaluations from her supervisors as early as 2006 and the conflicts with her supervisors continued throughout 2007, so no causal nexus). Given the record evidence, which Plaintiff does not dispute, concerning her history of tardiness and the discipline she received, she cannot demonstrate that, <u>but for</u> her protected activity of filing an EEOC complaint in October 2008 (regardless of how Defendants became aware of it), she would not have been terminated for repeated tardiness in April 2009.

With respect to Plaintiff's other argument, it falls outside the protections of Title VII. The law is intended to address discrimination in the workplace, not to ensure a "fair" work environment. The Court of Appeals has long held that:

> [W]e do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [anti-discrimination do] not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

<u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted).

Even assuming that Plaintiff was promised (by Weir in August 2007) a return to a 10:00 a.m. shift, she admits that she was told (by O'Malley in January 2009) that such a shift did not exist any longer because of the needs of the Department. Plaintiff does not even dispute that this statement was true; in fact, she concedes that employees do not set their own shifts. (Carswell Dep. at 77.) She merely argues that this decision was "unfair." Such a contention is not within the purview of federal anti-discrimination laws.

For these reasons, it is recommended that the motion for summary judgment filed on behalf of the remaining defendants, UPMC and UPMC Braddock Hospital (ECF No. 39), be granted.

Litigants who seek to challenge this Report and Recommendation must seek review by

the district judge by filing objections by February 25, 2014. Any party opposing the objections shall file a response by March 11, 2014. Failure to file timely objections will waive the right of appeal.

                                        s/Robert C. Mitchell_____
                                        ROBERT C. MITCHELL
                                        United States Magistrate Judge

Dated: February 11, 2014

cc:    Tonya Carswell
       306 East 12th St.
       Homestead, PA 15120